## McClellan vs. Sanford, impleaded, etc.

(1.) REFORMATION OF DEED : *Proof required.*
(2.) CONTRACT CONSTRUED : *Agreement to assign stock.*
(3.) STATUTE OF FRAUDS : *Promise not to be performed within a year— Executed consideration.*

1. A deed will not be reformed except upon clear and convincing proof of mistake.
2. Where A., owning twenty shares of railroad stock, represented by a single certificate, agreed to assign twelve shares thereof to B., in consideration of a promise by B. : *Held*, that the agreement on A.'s part was fulfilled by delivering to B. a separate assignment of his interest in the twelve shares, the certificate being held by a third person in trust for all parties interested.
3. A promise which, by its terms, is not to be performed within a year, is not within the statute of frauds, if a valuable *executed* consideration therefor is shown. So *held*, where the consideration was a conveyance of land and assignment of stock, both made within the year.

APPEAL from the Circuit Court for *Sauk* County.

Foreclosure of a mortgage executed by one Morehouse to the La Crosse and Milwaukee R. R. Co. in 1854, upon the N. W. ¼ of sec. 33, the N. E. ¼ of the N. E. ¼ of sec. 32, and the West half and S. E. ¼ of the S. E. ¼ of sec. 29, in said county, to secure Morehouse's note of same date, running to said company, for $2,000, payable in ten years, with interest payable annually. This note and mortgage were attached to a bond of the railroad company for the same

amount, having the same length of time to run, and bearing interest at the same rate; and they were made transferable together, and were purchased for value by the plaintiff. The action was commenced in 1868; and no payments had been made upon any of the instruments after 1857.

The west half and S. E. ¼ of the S. E. ¼ of sec. 29, and the N. E. ¼ of the N. E. ¼ of sec. 32 (160 acres), were sold and conveyed by Morehouse to one Adams (in November, 1855), by Adams to one Boorman (in January, 1856), by Boorman to one Duryee (in August, 1856), and by Duryee to *Sanford* (also in August, 1856). By the terms of each of these successive deeds, the grantee took the land subject to the above mentioned mortgage, and also agreed to pay $1,200 of said mortgage. The other 160 acres of the mortgaged premises, to wit, the N. W. ¼ of sec. 33, were sold and conveyed by Morehouse to one Clement in September, 1855, subject to the mortgage, and one-half thereof was sold by Clement to one Dawes, and the other half to Duryee, who thereupon sold it to *Sanford* (March 12, 1857), and caused it to be deeded to him directly from Clement. The deed contained a covenant against incumbrances, with the following exception: " Except a certain mortgage in favor of the La Crosse and Milwaukee Railroad Company of four hundred dollars, which the following explains : A mortgage was first given to the company by one Morehouse upon a ½ section, and for the amount of twenty hundred dollars. Morehouse sold one-half of his land and eight hundred in stock to Jacob Clement. Jacob Clement sold one-half of his ¼ section to one Dawes, and with it four hundred in stock, leaving said Clement 80 acres and four hundred in stock, being the same that is herein transferred to *J. F. Sanford*."

The successive alienees of different portions of the land were made defendants to the action. The complaint demands, among other things, that the 160 acres

conveyed by Duryee to *Sanford* in 1856, be sold to make the sum of $1,200, with interest accrued thereon, and that *Sanford* be adjudged to pay any deficiency.

*Sanford* answered, alleging that the words in the deed from Duryee to him referring to the mortgage in suit, " $1,200 of which the party of the second part agrees to pay," were inserted through mistake or fraud on the part of Duryee, being copied from the deed which the latter had received from Boorman; that he (said *Sanford*) did not know until after the commencement of this action, that the deed contained any such clause, or he would not have accepted it; that his agreement with Duryee was simply to pay $1,400 in goods for the land, subject to the incumbrance of the mortgage, without any undertaking on his part to pay any portion of the mortgage, and that in consideration of his paying for the land thus incumbered what was its full value if unincumbered, it was agreed between him and Duryee that of the $2,000 in shares of the La Crosse & Mississippi R. R. Co., for which Morehouse's note and mortgage were originally given, $1,200 should be the property of said *Sanford,* and that they should be issued and delivered within a reasonable time. It is alleged that in August, 1859, the $2,000 of stock were issued by the railroad company and delivered to Morehouse; that about the same time Morehouse offered to transfer and assign $1,600 thereof to *Sanford,* on condition that the latter would pay and save Morehouse harmless from said mortgage to the amount of $1,600, and *Sanford* refused to accept the stock on those conditions; that Morehouse then placed said stock in the hands of one Barlow, to be transferred to *Sanford* upon the condition above named; that *Sanford* is not now and never has been the owner of said stock so bargained for by him of Duryee, and has never received the least benefit therefrom, and the same has never been delivered to him, and therefore the consideration for any

supposed promise on his part in respect to paying or assuming any portion of the mortgage debt, has wholly failed.*

Said defendant further set up the statute of frauds as a defense against said alleged promise by him to pay $1,200 of the mortgage note, on the ground that the promise was not to be performed within a year,

---

* There was no specific finding by the court on this branch of the defense. The proof was, that in June, 1856, S. S. Barlow, Esq., of Sauk county, received from Mr. Morehouse a certificate issued to the latter for twenty shares of stock (of $100 each) in the La Crosse & Milwaukee R. R. Co. The certificate was dated July 1, 1854, and there was afterwards indorsed upon it, under date December 7, 1857, an assignment of *sixteen* shares of the stock to *Mr. Sanford,* and the four remaining shares to Mr. Dawes, but there was added thereto the following clause: "And they, the said *Sanford* and Dawes, are, in consideration of the premises, each in proportion to the amount of stock herewith assigned to him, to pay whatever sum I may be adjudged to pay upon the note and mortgage, or either of them, for which this stock was issued, and to save me harmless from the same, and from all costs in consequence thereof." Signed by Mr. Morehouse. It was conceded on the trial that *Mr. Sanford's* personal liability was only for $1,200, and not for $1,600 of the debt. *Mr. Sanford* testified that at the time of his first purchase from Duryee, "Something was said about railroad stock. I was to have that, but I have never have had or seen the stock. * * There was a certificate, or sort of one, that the railroad company would furnish stock, which I had. Duryee gave me a part at one time and a part at another. * * Duryee assigned $1,200 of the certificates at one time, and $400 the next time. * * I am sure the stock was not assigned to me. I never saw it. I asked Judge Barlow for it some ten years ago; it was at his house. He thought I would not want it on the terms that I would assume a part of the mortgage debt. I told him I did not want it on those terms. * * I got the assignments from Duryee, and left them both with a man by the name of Gilbert, of Tomah, six or seven years ago. He died, and the certificates are lost. * * I was to take the land subject to the mortgage, and he (Duryee) would assign over the stock, or the promise for the stock. * * I was to have the stock for taking the land subject to the mortgage. * * I presume there was an assignment on the certificate which Duryee gave from Morehouse; think it was made to him by the railroad company. I am not positive how it was; don't know in whose handwriting it was. I presume the assignment was made at the same time of the deed." On being recalled he testified: "The certificates I got at two different times were not stock, but mere promises for stock." Mr. Duryee, speaking of his first sale to *Sanford,* testified: "There was certain stock to go with it, but I never had the stock. I suppose some $1,200 of stock was to go with it. * * I had no certificates in regard to the stock at this time. * * I received no certificate or contract for stock of Boorman. I gave *Mr. Sanford* none. I can't tell who had the certificate for stock. Mr. Morehouse was in the neighborhood then. I never had the memorandum or contract for stock. I understood the stock was not then issued."

McClellan vs. Sanford, impleaded, etc.

and was not in writing signed by him. He also set up the statute of limitations, on the ground that the alleged cause of action against him personally did not accrue within six years before the commencement of this action. He also demanded that the deed from Duryee to himself be reformed by striking out the clause above quoted.

The court found that there was not sufficient evidence of any mistake in the deed from Duryee to *Sanford.* It also found that $1,200 of said mortgage debt, with interest thereon from January 1st, 1858, amounted to $2,354; that this amount was chargeable primarily on the 160 acres first sold by Duryee to *Sanford,* and that in case of any deficiency in the proceeds of the sale of said land to make the sum named, he would be personally liable therefor.

Judgment accordingly; and *Sanford* appealed.

*C. C. Remington* (with *Gregory & Pinney,* of counsel), for appellant, argued, upon the evidence, that the deed should be reformed. 2. There was a failure of consideration. About a year and four months after the execution of the deed from Duryee to *Sanford,* Morehouse assigned sixteen shares of the stock to *Sanford,* the parties to the deed meantime not knowing that the stock was issued. The mortgagor kept it in fact until it became worthless, and then assigned sixteen instead of twelve shares, and required the assignee to indemnify him against $1,600 of the mortgage debt beside interest and costs, which there is no pretense that he was bound to do. 3. If *Sanford's* acceptance of the deed with the clause in question is evidence of an express promise by him to pay the $1,200, still the defense of the statute of frauds or the statute of limitations is made out. (1.) If the agreement was to pay the money then and at once, more than six years having elapsed before the action was commenced, the claim is barred by the statute of limitations. (2.) If the promise was to pay as the mortgage became due,

then it was not to be performed within a year, and not being in writing, subscribed by him, it was void. 4. The $1,200 mentioned in the deed did not draw interest until it was due (no interest being expressed), and after due it only draws seven per cent. Yet the judgment charges appellant with eight per cent. from January 1st, 1858.

*David S. Ordway,* for respondent, argued that there was no sufficient evidence of any mistake in the drafting of the deed, and that the presumptions from the whole transaction tended strongly to support the deed. To the point that a deed will not be reformed except upon clear and satisfactory proof, he cited *Newton v. Holley,* 6 Wis. 592; *Lake v. Meacham,* 13 id. 355; *Fowler v. Adams,* id. 458; *Harrison v. Juneau Bank,* 17 id. 340. Such mistake must be *mutual. Story v. Conger,* 36 N. Y. 673; *Lyman v. United Ins. Co.,* 17 Johns. 373; *Nevins v Dunlap,* 33 N. Y. 680; Story's Eq. Jur. § 159. He also argued that *Mr. Sanford's* own testimony showed that even if the consideration of his promise to pay $1,200 of the mortgage. was in part Duryee's promise to assign $1,200 worth of the stock, this assignment was made by Duryee at or about the time he executed his deed to *Sanford.* The certificate of stock being for the whole twenty shares, and being held by Barlow as trustee for the parties interested, such separate written assignment of Duryee's interest was the only mode in which he could transfer it. To the point that *Sanford's* promise to pay, though not to be performed within one year, was not within the statute of frauds, the consideration being an executed sale and conveyance of land and assignment of stock, he cited *Cherry v. Heming,* 4 Wels. H. & G. 631; *Lawrence v. Fox,* 20 N. Y. 268; *Bun v. Beers,* 24 id. 180; *Bishop v. Douglass,* 25 Wis. 696; *Blyer v. Monholland,* 2 Sandf. Ch. 479; *Pomeroy v. Winship,* 12 Mass. 514; *Wilkinson v. Scott,* 17 id. 249; *Townsend v. Townsend,* 6 Met. 319; *Brackett v. Evans,* 1 Cush. 79.; *Pike v. Brown,*

7 id. 133; *Dearborn v. Parks,* 5 Greenl. 81; *Sinsiott v. McIntyre,* 3 Shep. (15 Me.) 201; *Thayer v. Niles,* 23 Vt. 494; *Voluntine v. Godfrey,* 9 id. 186; *Cone v. Tracy,* 1 Root, 479; *Bowen v. Bell,* 20 Johns. 338; *Massy v. Holland,* 3 Ired..197; *Wood v. Gee,* 3 McCord, 421; *Butler v. Lee,* 11 Ala. 885; *Morgan v. Betzenberger,* 3 Gill, 350; *Moore v. Beasley,* 3 Ham. 294; *Donellan v. Read,* 3 Barn. & Ad. 899; *Bracegirdle v. Heald,* 1 Barn. & Ald. 722.

*Remington, Gregory & Pinney,* in reply:

1. That there was, in the first instance, a paper issued by the company to Morehouse, which was a promise on its part that he should have twenty shares of stock; that divers assignments of this paper, or certain interests in it, as an obligation, were made; that the certificate of stock for which the mortgage was given was issued to Morehouse; and that the only assignment attempted to be made of it was on its back, which bound *Sanford,* if he accepted it, to pay more of the mortgage than he ever agreed to, are facts beyond dispute. 2. As to the real nature of the trade between *Sanford* and Duryee, the parties to that trade agree upon every material point. *Sanford* was to have the land and stock for $1,400 in goods, taking the land subject to the mortgage, and nothing was said about his paying any part of the mortgage. Duryee, interested against him, confirms every word he says. 3. Though a mistake on one side only might not be any ground for altering the terms of a written contract, it would be ground for rescinding the contract, or refusing to enforce its specific performance. Adams' Eq. *171. This is a proceeding in equity to compel *Sanford* to perform the alleged terms of his purchase. He did did not know of the existence of this clause in the deed until the action was commenced, and the case is, therefore, like that of *Boorman v. Am. Exp. Co.* 21 Wis. 152. See also, *King v. Woodbridge,* 34 Vt. 571. 4. The word "agreement" in the statute of frauds, means

what is to be done on both sides; and it has frequently been held upon this ground that guaranties were void if they did not contain the consideration as well as the promise. *Wain v. Warlters*, 5 East, 10; Notes to *Birkmyr v. Darnell*, 1 Smith's L. C. 460 et seq. It is plain that this agreement, i. e., what was to be done on *both* sides, could not be performed in one year, and unless part performance can take it out of the statute (as performance on one side only), then it is within the statute. *Lower v. Winters*, 7 Cow. 263; *Boydell v. Drummond*, 11 East, 142; *Sweet v. Lee*, 3 Man. & Gr. 452; Broome on Stat. of Frauds, §§ 288, 289. The case of *Donnellan v. Reed* (3 Barn. & Ad. 889) has been severely criticised in this country, and in the note to *Peter v. Compton*, 1 Smith's L. C. 539 ; and it has been held that entire performance on one side within the year will not take the case out of the statute, if that which is to be done on the other is not to be performed within the year. This seems to be the prevailing doctrine in this country. *Marcy v. Marcy*, 9 Allen, 8 ; *Broadwell v. Getman*, 2 Denio, 87 ; *Pierce v. Paine's Estate*, 28 Vt. 34; *Lockwood v. Barnes*, 3 Hill, 128 ; *Wilson v. Ray*, 13 Ind. 1 ; *Halloway v. Hampton*, 4 B. Mon. 415; *Lapham v. Whipple*, 8 Met. 59 ; *Bartlett v. Wheeler*, 44 Barb. 162; *Lower v. Winters*, 7 Cow. 263.

Dixon, C. J. The facts and circumstances of the transaction between Duryee and the defendant *Sanford*, as disclosed by all the testimony, tend very strongly to show that the clause of the deed in question was correctly inserted, and correctly represents the actual agreement of the parties. *Sanford* testifies that he bought the land, and agreed to pay and did pay $1,400 for it, in goods at cost prices, and was to take it subject to the mortgage ; and he repeats in his testimony that "the land was not considered worth any the less for the mortgage being on it." Duryee testifies to the

same thing, and gives the reason : " as it was supposed
the railroad company would pay it." The railroad
company was then sound and solvent, or supposed to
be by both the parties. Neither party apprehended
its insolvency or ultimate inability to pay the mort-
gage, and both believed it would be abundantly able
to pay and would pay it. Entertaining no doubts upon
the subject, they negotiated on that basis ; and hence
the mortgage was regarded as no incumbrance. *San-
ford* was indifferent to it, and was as willing to take
the land with the mortgage upon it, or subject to the
mortgage, as if no such incumbrance had existed.
" The premises were not," as he at another time tes-
tifies, " considered worth any the less on account of
the mortgage being on them."

Such being the views of the parties and the light in
which the transaction is to be examined, it is difficult
to perceive why *Sanford* should not have entered into
the agreement in question, or have assumed and prom-
ised Duryee to pay the mortgage, or why he should
have objected to receiving the deed with the clause in
question in it. And particularly is it difficult to per-
ceive this when it furthermore appears, as part of the
same transaction, that Duryee was to transfer to him
$1,200 of the railroad stock for which the mortgage
was given, that being a sum equal to the portion of the
mortgage which the deed recites he agreed to pay.
This stock must also have been considered valuable.
*Sanford* himself testifies that he bought some full paid
stock about the time he purchased the land, for seventy-
five cents on the dollar, and that it was quoted at
eighty-two cents in New York. The value of the
mortgage stock does not appear, nor does it seem to
have had an established price in market. It may have
been unsalable at the time, and probably was ; still,
considering the railroad company as sound and solvent,
and likely to remain so, it must have been regarded as
of very considerable value in the end. Indeed, *Mr.*

*Sanford* so testifies. For, speaking of the land being considered of no less value on account of the mortgage, he at one time says it was " because it was supposed the stock would be worth something." If this was the sole ground for considering the mortgage no incumbrance (though we do not think it was), it must have been because the parties supposed the mortgage stock would ultimately be at par or above par, for otherwise it would not pay the mortgage debt. At all events, it is very clear that they considered the mortgage as no incumbrance, and the stock of considerable value. Under these circumstances, it is not easy to see why *Mr. Sanford* should have hesitated to enter into the promise, or why he should have made any point upon the particular form of the agreement. On the contrary, the reasons why he should or might have made the promise, and why Mr. Duryee should or might have insisted on his doing so, seem very obvious. If, on the one hand, we regard the land as the principal object of *Mr. Sanford's* purchase, as his testimony would seem to justify, and the transfer of the stock as incidental and so as to secure or indemnify him against any possible loss which might arise from the mortgage, then it was most natural that Mr. Duryee should have required and that *Mr. Sanford* should have willingly undertaken to be personally responsible for the payment of the mortgage debt. Considering the stock as valuable, and at least equivalent to the mortgage debt, or that part of it to which *Mr. Sanford's* land was subject, and as full and ample security against loss by the mortgage, it would indeed be very strange, judging from the motives by which persons would ordinarily be actuated in such a case, if Mr. Duryee had not required *Mr. Sanford* to become personally liable for so much of the mortgage debt. Transferring to *Mr. Sanford*, to become absolutely his, securities considered of equal value with the mortgage, as indemnity against it, it would seem almost unac-

countable if he had not obtained from *Mr. Sanford* a promise to pay that part of the mortgage debt. Mr. Duryee, by reason of a like clause in the deed from Boorman to himself, was still personally liable to the mortgagee or holder of the mortgage for $1,200 of the mortgage debt, notwithstanding he had, in effect, paid it by the transfer of stock to *Mr. Sanford*; and, in the event of that liability being enforced, his only recourse upon *Mr. Sanford* would be through the medium of such promise. He would most naturally, therefore, have required it for his own indemnification, since without it he would be subject to double payment with no right to fall back on the party to whom he had first paid.

But if, on the other hand, we regard the transaction as a purchase by *Mr. Sanford* of both the land and the stock, there were still the same motives for requiring the promise, and the same inducements for giving it. The stock, as we have seen, was considered by the parties of value equal to the sum represented by the mortgage, and in addition to this they had no doubt that the railway company would pay the mortgage as it had agreed. Had their expectations in this respect been realized, as they seemed confident they would be, then *Mr. Sanford* would have been a great gainer by the purchase. He would have had $1,200 in stock worth so many dollars, besides any dividends which might have been declared, and he would have had the land free from incumbrance, and all for $1,400 paid in goods. These were certainly no small inducements for the promise, and no slight reasons for Mr. Duryee's having insisted on it, if he in fact did so.

We have referred to these facts and circumstances attending the transaction, not because they are to be regarded as outweighing clear and positive proof that the promise was not made, or that the clause was inserted in the deed by mistake, but because, in our judgment, the case contains no such proof. The proof seems to

us to be vague and unsatisfactory, and, giving it the utmost effect, to leave the matter in much doubt; and in such a case it will be conceded, we think, that considerations of the kind above mentioned will have considerable weight. The testimony here to show the mistake is entirely that of the parties themselves to the transaction, and we may almost say that of *Mr. Sanford* alone. Mr. Duryee's testimony with respect to the agreement or promise to pay the mortgage is but of the negative kind. In common with *Mr. Sanford* he testifies positively that the deed was to be made subject to the mortgage, or that portion of it which was equal to the amount of stock transferred, but he does not so testify with regard to the agrement to pay it. As to that, he exhibits a want of memory, and only says that, so far as he can recollect, nothing was said between him and *Mr. Sanford* about his assuming any portion of the mortgage debt. This is mere negative testimony, or testimony based on a want of recollection. He does not testify that such agreement was not made. To this last point, therefore, which is the very point upon which the question must turn, we have only the testimony of *Mr. Sanford*, which, like that of his co-defendant Duryee, was given over fourteen years after the events in controversy transpired, and when there was much reason for supposing that neither could remember to testify with accuracy and positiveness to what did take place, or what the actual agreement or understanding between them was. And when to this testimony of *Mr. Sanford* we oppose the facts testified to by the witness Barlow, who drew the deed and inserted the clause in question by direction of Mr. Duryee, and after inquiry as to the nature of the agreement made of Mr. Duryee, in whose mind the facts were then fresh, and who must be presumed to have stated them correctly, as he had no motive for misstatement, or, if he had, was almost sure of immediate detection by *Mr. Sanford*, to whom the deed was to be

delivered—it would seem that the fact of mistake, which the law requires to be most clearly and unequivocally proved, has by no means been so established. And when also we consider the fact that *Mr. Sanford* accepted the deed and retained it in his possession for over thirteen years, and until after this action was commenced, making no objection to it on account of the clause in question, though he says he did not discover it, and the further fact that he testifies under great pressure of interest, which, though it may not have consciously affected his testimony, as we have no doubt it did not, yet may have done so unconsciously; we say, when these facts are also considered, that the foundation for adjudging a mistake seems still more shadowy and uncertain.

In a recent case, *Kent v. Lasley*, 24 Wis. 654, this court had occasion to express a doubt whether a deed absolute on its face could be turned into a mortgage by the unaided testimony of the grantor, however intelligent and credible he might be as a witness. We thought it would be a most dangerous precedent to establish. The similarity between cases of that kind and cases like the present is noticed in the opinion, and the former rules and practice, and the nature and extent of proof required in chancery in order to overcome or set aside a written instrument as evidence of the agreement between the parties, are stated. The decisions of this court in cases of mistake, showing that the written paper ought to be treated as a full and correct expression of the intent until the contrary is established beyond reasonable controversy, are also cited. There is no difference in principle between the two classes of cases, and both stand on the same footing with respect to the nature and degree of evidence required. The same convincing proofs must be given in both, or the written contract will not be disturbed. And what was there said in relation to overturning a deed upon the testimony

of the grantor alone, is equally applicable where the proposition is to set aside or annul any of its provisions upon the testimony of the grantee alone. We greatly doubt whether it ought in any case to be done, and believe it would be a most dangerous precedent to establish. But if any such case could be presented, we are quite satisfied this is not one. There are too many circumstances weighing against the testimony of *Mr. Sanford* to allow us to do it; and, hard though the case may be, he must abide by the deed as written.

The other branch of *Mr. Sanford's* defense, namely, that there was a failure of consideration because the stock was never assigned to or received by him, requires less consideration. We entertain little doubt that all the assignment or transfer intended by the parties or necessary to carry out their agreement was, in fact, executed and delivered. The stock was represented by a single certificate for 20 shares at $100 each, originally issued to Morehouse, the mortgagor, and from necessity, upon a transfer of a part only of it, the certificate would not also be delivered, or, at least, might not be. The several parties in interest could not all hold the certificate at the same time, and *Mr. Sanford* seems to have been willing to receive a separate assignment from Duryee, as Duryee and the previous assignees had done, the original certificate remaining in the hands of Mr. Barlow in trust for the parties interested. That this was the manner of transferring the stock sufficiently appears, we think, from *Mr. Sanford's* own testimony. He says: "There was a certificate, or sort of one, that the railroad company would furnish stock, which I had." And again he says: "I got the assignments from Duryee, and left them with a man by the name of Gilbert, of Tomah." The fact of *Mr. Sanford's* becoming so indifferent, and not pursuing the matter so as to obtain certificates of stock in his own name, is sufficiently accounted for by

reason of the stock having soon after become utterly worthless.

The only remaining question is upon the statute of frauds, and whether the agreement is void because it "by the terms is not to be performed within one year from the making thereof," and is not "subscribed by the party charged therewith." R. S. ch. 107, § 2. The agreement is contained in the deed from Duryee to *Sanford,* which deed was not signed or sealed by *Sanford.* "It is, therefore," as was held by this court in *Bishop v. Douglass,* 25 Wis. 696, "a mere promise which acquires its binding force by acts *in pais,* without any signature or sealing whatever." The question is, whether the agreement falls within the clause of the statute above referred to, because not to be performed within one year, or whether its having been fully performed on one side, by the execution and delivery of the deed, takes it out of the statute. The authorities upon this question are divided, though with a decided preponderance in favor of the validity. In Massachusetts, New Hampshire, Vermont and New York, it is held that a promise to pay, not reduced to writing and subscribed by the party, is within the statute, and no action can be maintained upon it, if not to be performed within one year, although made upon a full and valuable consideration executed by the promisee and received by the promisor at or before the time. *Marcy v. Marcy,* 9 Allen, 8; *Emery v. Smith,* 46 N. H. 151; *Pierce v. Estate of Paine,* 28 Vt. 34; *Broadwell v. Getman,* 2 Denio, 87; *Lockwood v. Barnes,* 3 Hill, 128. On the other hand, the English courts and the courts of many of the states hold the very opposite doctrine—that performance on one side at the time, or within the year, takes the contract out of the statute, and that it may be enforced. *Cherry v. Heming,* 4 Exch. (Welsby, Hurlstone & Gordon) 631; *Donellan v. Read,* 3 Barn. & Ad. 899 [23 E. C. L. 215]; *Hoby v. Roebuck,* 7 Taunt. 157 [2 E. C. L. 57]; *Boydell*

Wis. xxvi—77

*v. Drummond*, 11 East, 152; *Souch v. Strawbridge*, 52 E. C. L. 806; *Smith v. Neale*, 89 E. C. L. 66; *Berry v. Doremus*, 30 N. J. Law R. (1 Vroom), 403 ; *Haugh v. Blythe's Executors*, 20 Ind. 24; *Curtis v. Sage*, 35 Ill. 22; *Morgan v. Bitzenberger*, 3 Gill (Md.) 350; *Johnson v. Watson*, 1 Kelly, 348; *Rake's Adm's 'v. Pope*, 7 Ala. 171. It will be observed, on examining these cases, that in some the question was nearly identical with the present, except that the promise was not evidenced by anything written in the deed; and that in all it was held that a verbal promise to pay beyond the year, if made upon an *executed* consideration, whether lands conveyed or goods and chattels sold and delivered, or other consideration of value, is valid. The doctrine of these cases is, that the provision of the statute now being considered applies only to contracts not to be performed *on either side* within the year.

It might be of some interest, perhaps, to pursue the investigation, and state the reasons upon which these different lines of decision proceed, were it not for the fact that the same question has been already settled by an adjudication of this court, and that in accordance with the rule established by the cases to which reference is last above made.    As it is, we only remark of the cases holding the opposite rule, that whilst they adhere to a strict and literal construction of the statute in order to close the door to the mischiefs which they suppose the statute was designed to prevent by excluding parol evidence after the lapse of one year, they yet seem to leave the door wide open to the same mischiefs by allowing parol evidence to be introduced to show what the contract was, and what the price or sum agreed to be paid, for the purpose of enabling the promisee or creditor to recover upon a *quantum meruit* or *quantum valebat*. The advantage of this course of decision is not perceived; and if it were, we should not be inclined to depart from a rule already

laid down, especially when it is sustained by so much and such respectable authority. *Coyle v. Davis* (20 Wis. 564, 569) presented the question upon much the same state of facts, and it was there held that the oral agreement to indemnify or relieve the mortgagor from personal liability in consideration of his conveyance of the equity of redemption, was valid and obligatory; and by that decision the present case must be governed. The promise is not within the statute of frauds, and is, therefore, binding and available against *Mr. Sanford* in this action.

*By the Court.*—Judgment affirmed.