Schriber vs. LeClair, imp.

SCHRIBER, Respondent, vs. LECLAIR, imp., Appellant.

*September 24 — October 12, 1886.*

*Equitable mortgage: Land contract: Usury.*

| | |
|---|---|
| 66 | 579 |
| 75 | 426 |
| 66 | 579 |
| 78 | 660 |
| 66 | 579 |
| 84 | 247 |
| 84 | 608 |
| 66 | 579 |
| 90 | 102 |
| 66 | 579 |
| 97 | 241 |
| 66 | 579 |
| 102 | 554 |
| 66 | 579 |
| 115 | ¹277 |
| 115 | ¹439 |
| 66 | 579 |
| 117 | ¹333 |
| 117 | ³334 |

1. Whenever property is transferred, no matter in what form or by what conveyance, as the mere security for a debt, the transferee takes merely as a mortgagee, and has no other rights or remedies than the law accords to mortgagees.
2. The want of a personal agreement by the borrower to repay the money is not conclusive that the conveyance was not intended as a mortgage, but merely a circumstance to be considered with the other evidence in the case.
3. The defendant, having ascertained the value of the timber on certain government land, but not having the money to enter it, applied to the plaintiff, who furnished the money and took the title to the land in his own name, giving to the defendant a contract by which he agreed to convey to him the undivided two-thirds of the land upon repayment within one year of the sum paid for entering the whole, or upon the plaintiff's giving, at the end of the year, his note for that sum, with interest at eight per cent., secured by mortgage of the land conveyed, and further agreed to convey to him the other undivided third upon payment of the estimated value of one third of the timber on the whole (being a sum greater than that paid for entering the land). The defendant agreed to pay the taxes on the land for the year, and to perform the conditions of the contract on his part at the times and in the manner therein set forth. The amount paid for entering the land was treated by the parties as an indebtedness from the defendant to the plaintiff. In an action for the strict foreclosure of the contract to convey, *held:*

    (1) The transaction was in substance an equitable mortgage of the land by the defendant to the plaintiff, to secure the repayment of the money paid by the latter to enter the land.

    (2) By the contract the plaintiff in effect reserved one third of the land for the use of the money advanced by him, and had also the right to be repaid such advances with interest after one year at eight per cent. Such agreement was therefore usurious, and the plaintiff forfeited his right to any interest. *Case v. Fish,* 58 Wis. 56, distinguished.

    TAYLOR, J., dissents.

APPEAL from the Circuit Court for *Brown* County.

The case is thus stated by Mr. Justice CASSODAY:

"This action is for the strict foreclosure of two land contracts set forth in the complaint, each of which recited a consideration of one dollar, and named the plaintiff as the 'party of the first part,' and the defendant, *Joseph LeClair*, as 'party of the second part.'

"The contract constituting the first cause of action is dated October 26, 1882, and is to the effect that the plaintiff, on the payment to him, one year from the date thereof, of the sum of $2,849.33, and also the further sum of $2,451.99, agreed to convey to the said defendant all of the land therein described, by good and sufficient deed; that, in case the defendant so elected, he might and should have the right, at the end of one year, to pay the above sum of $2,849.33 in cash, and give for the above sum of $2,451.99 a note bearing interest at eight per cent., payable in one year, secured by a mortgage on all of said lands; that in case said defendant should not see fit, at the expiration of one year, to make the payments as above set forth, then, in that case, the plaintiff agreed to convey to him, by good and sufficient deed, an equal undivided two-thirds of all of said lands, upon the delivery to him of defendant's note for $2,451.99, with interest at eight per cent., payable in one year, secured by a mortgage on the two-thirds interest in said lands so conveyed to him; that the defendant thereby agreed and bound himself to pay the taxes on said lands for the year 1882, if any there be, and also to perform all the conditions on his part to be performed, and at the times and in the manner therein set forth. A description of the lands is then given, and the contract made binding upon the heirs, executors, administrators, and assigns of the respective parties, and signed by them.

"The contract constituting the second cause of action bears date November 6, 1882, and is in all respects like the

first, except it relates to different lands, and the amount which the defendant had the option of paying to the plaintiff within a year for one third of the land was $1,848, and the amount which he was to pay to the plaintiff at the end of the year in cash, or give his note to him for, due in one year, with eight per cent. interest, secured by a mortgage upon the equal undivided two-thirds of the lands therein agreed to be conveyed to him by the plaintiff, was $1,456.50.

" The complaint alleged the breach of each contract on the part of the defendant by failure to pay principal, interest, and taxes.

" The answer substantially admits the several allegations of the complaint, and alleges by way of counterclaims, in effect, that the transaction resulting in giving the first contract was an equitable mortgage to secure to the plaintiff the repayment of the $2,451.99 advanced by him in obtaining title to the land described in that contract, and interest and one third of the land for the use of his money; that the transaction resulting in giving the second contract was an equitable mortgage to secure to the plaintiff the repayment of the $1,456.50 advanced by him in obtaining the title to the land described in that contract, and interest and one third of the land for the use of his money; that in each case the transaction was usurious; that the plaintiff had received a large payment on the debt through the sale of collaterals; that the defendant, with the knowledge and consent of the plaintiff, removed from said lands 900,000 feet of pine timber, board measure, the stumpage value of which was two dollars per thousand feet; that the defendant had, since June 30, 1885, offered to perform and tendered performance on the theory of equitable mortgages, and prayed judgment accordingly.

" The plaintiff, replying to said counterclaims respectively, admitted some of the facts alleged, and denied others, and alleged that a part of the moneys received through the sale

of collaterals was to apply on taxes which the defendant agreed to pay, but which were in fact paid by the plaintiff.

"The court made findings upon the several issues, and, among other things, ordered judgment of strict foreclosure, unless the defendant paid the plaintiff $3,994.06 as the balance due, with interest from January 25, 1886, within thirty days from service of a copy of the findings, or the defendant gave his notes therefor due in nine months, at eight per cent. interest, secured by mortgages upon the undivided two-thirds of said lands, with the usual covenants for the payment of taxes. Judgment was thereupon entered accordingly, and requiring the mortgage to contain a stipulation 'for a reasonable attorney's fee in case of foreclosure.' From that judgment the defendant appeals."

*W. H. Webster*, for the appellant.

For the respondent the cause was submitted on the brief of *Weisbrod, Harshaw & Nevitt.* They contended, *inter alia*, that the contracts were not usurious. Collyer on Partn. (6th ed.), sec. 68; Tyler on Usury, 185; *Fereday v. Hordern,* 1 Jac. Ch. 144; *Gilpin v. Enderbey*, 5 Barn. & Ald. 954; *Case v. Fish*, 58 Wis. 56, and cases cited. It is a question of fact whether an agreement is merely made as a cover for an usurious charge for forbearance. *Smith v. Marvin*, 27 N. Y. 137; *Wright v. McAlexander*, 11 Ala. 236; *Vail v. Heustis*, 14 Ind. 607; *Beckwith v. W. M. Co.* 14 Conn. 594; *Spain v. Hamilton's Adm'r*, 1 Wall. 604; *Howe v. Carpenter*, 49 Wis. 697; *Hale v. Haselton*, 21 Wis. 320. The trial court has found that there was no loan to the appellant, and that the contracts were not entered into for the purpose of evading the usury laws. Under a well-settled rule these findings should not be disturbed.

CASSODAY, J. There is some little discrepancy between the testimony of the plaintiff and the defendant, *Joseph LeClair,* as to just what was said between them a short time prior to

the making of the first written contract, and which finally
resulted in the making of that contract.    The same is true ·
as to the conversation preliminary to the second contract.
There is, however, no material difference as to the substance
of either of the transactions agreed upon.    It is, .in effect,
admitted that the defendant was, prior to the first conversa-
tion, a surveyor engaged in the business of a woodsman,
locating lands, and ascertaining the amount and value of
timber upon them; that he had prior to that time examined
and knew the lands described in the first contract, and had
his minutes of the description of them; that the lands at
the time belonged to the state or the United States, and
were subject to entry; that the defendant had not at the
time the money with which to enter the lands, and accord-
ingly applied, with his minutes, to the plaintiff for the pur-
pose of making some arrangement for the entry of the
lands; that the plaintiff insisted upon having an interest in
the lands, and the defendant consented; that the defendant
then estimated that there was 5,500,000 feet, board meas-
ure, of pine upon the lands described in the first contract,
worth $2 per thousand feet, or $11,000; that it would re-
quire, to enter that land and obtain the title, $2,451.99,
leaving a surplus or profit of $8,548.01, of which one third
would be $2,849.33; that the plaintiff agreed to these esti-
mates, and from them obtained the two amounts which he
had inserted in the first contract; that thereupon, and in
pursuance of an agreement between them, the plaintiff paid
into the land office the $2,451.99, and took the title to such
lands in his own name when the parties made and signed
the first written contract; that the two amounts named in
the second contract were ascertained from similar estimates
and an agreement as to the amount of pine on the lands
therein described, and thereupon, and in pursuance of an
agreement between them, the plaintiff paid into the land
office the $1,456.50 mentioned in that contract, and took the

title in his own name when the parties made and signed the second written contract.

The plaintiff does not claim that, upon his acquiring the legal title to the lands, they thereby became absolutely his property. He testified: "I was the party who had the money, and I was to enter the lands with that money, *and have an interest·in it.* The agreement was in accordance with whatever the arrangement was between him and I. In *addition to the interest* which I was to have in the land, *I was also to have back my money.* That was in the *original* agreement. *I was to have back my money which it cost me to enter the land with.* You didn't state it correct. *I was to have back the purchase price.* I was to have no interest on the money which I invested, unless the *interest in the land* gave me an interest, a *third interest,* in the land. *I was to have a third interest in the land at the expiration of one year.* That is a fact. The agreement which I executed *contained* the *purchase* price."

Going back of the mere form of the writing, considered by itself, as we must in equity, and looking at the substance of the first transaction, as revealed by the evidence and partially embodied in the first contract, and we find that the plaintiff paid into the land office the $2,451.99 mentioned in that contract, and took the title in his own name to the lands therein described, with the understanding and upon the agreement that the equal undivided one-third of those lands (estimated to be worth $11,000) should be held by him for himself as his own property absolutely; that he should for one year continue to hold the legal title to the other equal undivided two-thirds solely as security for the repayment to him by the defendant of the $2,451.99 so advanced; that at the end of the year the defendant should have the optional right to a conveyance of the plaintiff's undivided one-third, upon the payment to him of $2,849.33, and should then also have a right to a conveyance of his

own undivided two-thirds upon the repayment in cash of the $2,451.99 so advanced, or, in lieu of the cash, his note for that amount due in one year, with interest at eight per cent., secured by a mortgage upon the two-thirds to be so conveyed.

In equity the transaction was substantially the same as though the plaintiff had only taken the title to the equal undivided one-third of the lands, and the defendant had taken the title to the other equal undivided two-thirds of the lands, and thereupon given to the plaintiff his note for the $2,451.99, payable and drawing interest as stated, secured by mortgage on said two-thirds of said land, and at the same time taking from the plaintiff an optional agreement for the purchase of his one-third at the end of the year for the $2,849.33. Why was it agreed that the defendant could only have a conveyance of the equal undivided *one*-third upon the payment of $2,849.33, but should have a conveyance of the equal undivided *two*-thirds upon the payment of only $2,451.99? Manifestly, because the one-third was regarded and treated by the parties as absolutely the property of the plaintiff, whereas the two-thirds was regarded and treated by the parties as really the property of the defendant, but the legal title to which was held by the plaintiff as security for the repayment of the money he had advanced to acquire the legal title to the whole. The nature of the second transaction, resulting in the second contract, was substantially the same as the first. If one was in substance an equitable mortgage, the other was also. True, as claimed, the defendant had no interest in the lands before the parties met. Neither had the plaintiff. But, as conceded, the defendant had hunted up the lands, made minutes of their descriptions, and estimated the amount and value of the timber upon them. This certainly was of value in securing the lands. *Tucker v. Grover*, 60 Wis. 240; *Bell v. Thomas*, 61 Wis. 267. Manifestly it was

regarded by the parties as of great value, and hence was put into the transaction, with the plaintiff's money, so that the two parties could secure the title and share the benefits as agreed.    It is well settled that "whenever property is transferred, no matter in what form or by what convey- ance, as the mere security for a debt, the transferee takes merely as a mortgagee, and has no other rights or remedies than the law accords to mortgagees." *Hoile v. Bailey*, 58 Wis. 448; *Starks v. Redfield*, 52 Wis. 352, and cases there cited; *Howe v. Carpenter*, 49 Wis. 702.    Accordingly it has often been held by this court, in the cases there referred to, that where the owner of the equity of redemption procures another to advance money, and bid in his property on sher- iff's sale, and take the title thereof in his own name, with the understanding that he will reconvey the same to such original owner on repayment of the money· so advanced and interest, the transaction is in equity a mortgage.    The same principle has been applied where the lands had been purchased from a third person for the use and benefit of one in possession, with an understanding that they should be reconveyed on payment of the purchase price.    *Ibid.*

It is contended that neither of the transactions should be treated as an equitable mortgage, because "there is no covenant in either of the contracts compelling the appellant to pay anything, . . . except to pay the taxes for 1882;" that the defendant made no promise that he would buy any land or pay any money, and could not be com- pelled to.    The question is not whether the defendant was bound by the contract to accept a deed of what was re- garded as the plaintiff's one-third, and pay him therefor the $2,849.33, but whether he was under any agreement or obli- gation to pay or secure to the plaintiff, as mentioned, at the end of the year, the $2,451.99 advanced by him as the purchase price of the lands.    In other words, was the rela- tion of debtor and creditor created between the parties?

By the contract the defendant not only expressly agreed and bound himself to pay the taxes, as stated, but also expressly agreed " to perform all the conditions " of the agreement on his part to be performed, and *at the times* and in the manner therein set forth. It is conceded, in effect, that the plaintiff was expressly bound by the contract to convey to the defendant, at the end of the year, the undivided two-thirds of the lands upon condition of payment or tender of the $2,451.99 in cash, or by note and mortgage as stated. That was among the " conditions " which the defendant expressly agreed to perform. Moreover, the express agreement to convey raised at least an implied agreement to accept of such conveyance and pay the amount named in cash or by note and mortgage. *Vilas v. Dickinson*, 13 Wis. 488; *Lowber v. Connit*, 36 Wis. 183; *Hutchinson v. C. & N. W. R. Co.* 37 Wis. 601; *Schweitzer v. Connor*, 57 Wis. 179; *Howe v. Carpenter, supra.*

The plaintiff's complaint speaks of the sum of $2,451.99, " to be paid by the defendant," and alleges the failure of such payment as a breach of the contract; and the same as 'to the $1,456.50. The plaintiff's reply repeatedly speaks of those sums as the " indebtedness of the defendant " to him " under the two agreements mentioned." It is evident that the plaintiff understood the two sums last named as an existing indebtedness against the defendant. As observed, he testified that it was in the original agreement that he was to have back his money,— the purchase price. Again, he testified, in effect, that soon after the year expired the defendant came to him and said he had not got any money and could not pay; that he then asked the defendant what he could do; and when he replied that he could do nothing, he told him that he must be able to do something, and asked him if *he could not sell the lands;* that the defendant then proposed to " cut off a million feet of this pine, and take that on account, and, after a while, when that

gets around, pay this *indebtedness;*" and that he "had to consent to it." Manifestly, the plaintiff understood that the defendant had agreed to repay to him the money he had advanced. He expected to get it, and regarded the transactions as security for it. Besides, he testified that he always considered the defendant's financial standing to be pretty fair. We think it is clear from all the evidence, as well as the contracts, that if the defendant did not expressly agree to repay to the plaintiff the amounts advanced by him for such purchases in cash, or by notes and mortgages, as mentioned, then he did, at least, so agree by necessary implication. That both of the parties recognized their relations to be that of debtor and creditor seems to be very evident. This court has very frequently recognized the existence of such relation where it was much less firmly established than here. *Starks v. Redfield,* 52 Wis. 353, and cases there cited. See, also, *Jones v. Parker,* 51 Wis. 218; *Rockwell v. Humphrey,* 57 Wis. 410; *Hoile v. Bailey,* 58 Wis. 448.

In *Rockwell v. Humphrey, supra,* the authorities are classified, showing that, whenever the language of the instrument is equivocal, the question is always one of intention; and numerous cases are cited, both English and American, to the point that " the want of a personal agreement by the borrower to repay the money is not conclusive that the conveyance was not intended as a mortgage, but merely a circumstance to be considered with the other evidence in the case." It is there said that " where the relation of debtor and creditor is created by the transaction, or previously existed and by express language or fair implication continues, and the possession is retained by the vendor, and the value of the property is greatly in excess of the consideration paid, the transaction has usually been held to be a mortgage." Here, as we have seen, the relation of debtor and creditor was created. The estimated value of

the land was greatly in excess of the purchase price paid. The defendant, in effect, went into the possession. The plaintiff was not only to have one third of all the land, but his money back, with interest, after the end of the year. But it is unnecessary to discuss questions of law which, in a long series of cases, commencing in 1 Wis., have been discussed so often and so fully by the different members of this court as to leave nothing unsaid on the subject. We must hold that each of the transactions stated was, in legal effect, to secure the repayment of the moneys advanced by the plaintiff, and hence an equitable mortgage. Such being the nature of the contracts which the plaintiff made with the defendant, we must now consider the legal consequences which must necessarily follow.

The statute provides that "no person  .  .  .  shall, directly or indirectly, take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action than at the rate of ten dollars upon one hundred dollars for one year." Sec. 1689, R. S. "All  .  .  .  assurances, conveyances, and all other contracts or securities whatever, whereby there is reserved or secured a rate of interest exceeding ten dollars on one hundred dollars for one year, shall be valid and effectual to secure the repayment of the principal sum loaned; but no interest shall be recovered on such securities, or on any money or thing loaned by such contract," etc. Sec. 1690, R. S. "Every person who, for any such loan or forbearance, shall have paid or delivered any greater sum or value than is above allowed to be received, may  .  .  .  recover, in an action against the person who shall have taken or received the same,  .  .  .  treble the amount of the money so paid, or value delivered, above the rate aforesaid, if such action shall be brought within one year after such payment or delivery." Sec. 1691, R. S.

As already suggested, the plaintiff, by the agreement in

each transaction, reserved the equal undivided one-third of the land for the use of his money advanced to secure the same, together with the right to the repayment of the full amount so advanced within a year, and, if not then paid, the repayment of the amount with interest at eight per cent. thereafter. Such reservation, so far as it exceeded the rate of interest allowed by law, was illegal.

The learned counsel for the plaintiff quotes from the opinion of the chief justice in *Case v. Fish*, 58 Wis. 107, in support of his contention that the transactions were in the nature of partnership adventures, and hence should not be treated as usurious. It is said that, upon the authority of that case, the learned trial judge rejected the defendant's theory of equitable mortgages, and adopted the plaintiff's theory of a strict contract for the sale and conveyance of land pure and simple. But the cases are broadly distinguishable, and really have nothing in common. In the *Fish Case*, the great mass — certainly more than nine tenths of the *corpus* — of the property had no fixed and permanent continuance. It consisted of notes, book-accounts, bills receivable, raw materials, materials in process of manufacture, stock in trade scattered through many states and constantly being sold, and other varieties of property too numerous to mention, all of which was continually shifting, and being disposed of, and changing its form from one kind of property to another, so that it was impossible to acquire any permanent security upon it by way of mortgage, equitable or otherwise. Besides, it was a continuing, active business, employing a large force of men and machinery, conducted in the name of Mr. Case alone, and very largely on his credit and responsibility, so that his liability for the debts of the concern was continually shifting, and ranging from one to five hundred thousand dollars, and upward. Obviously there was no similarity between that case and this.

The defendant did not attempt to recover treble the ex-

cess over lawful interest within the year as provided in one of the sections of the statute quoted; but that did not preclude him from recovering back such actual excess, as at the common law. *Wood v. Lake*, 13 Wis. 84; *Fay v. Lovejoy*, 20 Wis. 403. The law treats the debtor, under such circumstances, as "the weak and necessitous" party, who is imposed upon, and the creditor alone as the violator of the law. *First Nat. Bank v. Plankinton*, 27 Wis. 183; *Clarke v. Lincoln Lumber Co.* 59 Wis. 661. The result is that, although the parties treated the undivided one-third of all the lands as the property of the plaintiff absolutely, yet, as such reservation was unlawful under the statutes quoted, he must be regarded as having taken the title to all the lands as mere security for the repayment of his money.

The court found, in effect, among other things, that the plaintiff had paid taxes on the lands as follows: April 2, 1884, $250.86, and December 30, 1884, $270.25; that the defendant had paid to the plaintiff, by way of the collaterals mentioned, $952.48; and that during the trial the defendant tendered to the plaintiff the sum of $3,644.44, and deposited the same in court, with the clerk thereof. Since, under the statutes, the plaintiff could only recover the moneys advanced by him without interest, which amounted to $3,908.49, and the taxes paid by him, with interest, which, at the time of the trial, amounted to $573.32, less the $952.48 paid, as stated, it follows that the amount tendered and paid into court was sufficient to satisfy all that the plaintiff was entitled to recover under the statutes; and hence the defendant complied with the requirements of sec. 1692, R. S.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to dismiss the plaintiff's complaint, and to enter judgment in favor of the defendant upon his counterclaims, to the effect that, within such time and in such manner as the trial court may

direct, the plaintiff convey to the defendant, *Joseph LeClair*, all the lands described in the complaint, and that upon so doing the said plaintiff shall be entitled to all the moneys so deposited in said trial court; and for such other proceedings as may be necessary to carry into execution this mandate.

TAYLOR, J. After a careful reading of the evidence in this case, and of the argument in the very able opinion written by Justice CASSODAY, I am unable to agree that the evidence shows that the relation of mortgagor and mortgagee existed between the respondent and the appellant, *LeClair*, in respect to the lands in question. The only witnesses in regard to the transactions between the parties, other than the written contracts made, and the written communications between the parties after the making of the contracts, are the respondent on the one side and the appellant, *LeClair*, on the other.

*Schriber* testified as to what took place before the written contracts were made, as follows: " In the fall of 1882, forepart of October, *Mr. LeClair* came to me with these minutes. He claims that he asked me for a loan. I don't recollect that he said anything to me about borrowing money. He might have said so, but I don't believe it. I don't know; I don't recollect it. He spread his minutes out before me. He says, 'See I have got some nice land I would like to have entered;' and I says, 'Very likely. I don't like to enter lands I don't know anything about, and I have got taken in here only a short time ago,' which I really had; and I refused on that account at first. Then I asked him, ' Why don't you get them entered at home?' 'Well, he says, 'I have had some land entered by Mr. Beyer—a gentleman by the name of Beyer—and Smith, and I have always had the misfortune of their gobbling up all there was in it, and I would like to have you enter these lands,

and give me a fair show.' Well, after considering the matter duly, I concluded that I would do so. He gave me the minutes, and I said: 'How are we going to figure this now?' I wanted an interest in the land. He says, 'All right, of course that is understood that you shall have an interest in the land;' and he proposed then to figure it on the basis of about what the pine was worth. I knew white pine was worth $2 per thousand; but his estimates showed a good deal of Norway. He concluded that that was about the right figure,— to put it at about $2 per thousand. I agreed to that, and I took these minutes from him, sent my money in a draft to Madison, and some of it to Menasha, and entered these lands. Subsequently we executed this contract,— the first contract; in the spirit that we talked about in the arrangement of co-partnership, you might say that we went into this matter. It would look very queer of a man of my make, that I would lend a man money at ten per cent. interest on that kind of security. If I wanted to lend the money, I would have asked him for security in addition to the purchase money of that land,— would not have taken it, under no account; and that was done in the first lot, in this case. In the second lot of lands, when he came around again, we went through the same performance. There was nothing said about the understanding, but what it was the same as before; and I think, on the Menasha lot of lands, I sent a man from the office with the money to the land office. My boy had the money from me in his pocket, or a draft,— I don't remember which,— and I got, in due time, the certificates and papers. I did the whole transaction, on my part, more to help *Mr. LeClair*, on the statement that he had made to me 'that he had never made much on such transactions that he had been in with other people.' Never loaned *Mr. LeClair* any money directly. He occasionally had some paper that belonged up in our county, and it may be that once or twice, on the indorsement of Mr. Beyer, I let him have some

money; that was bank transaction. At the time of the entering of these lands I loaned him no money. I loaned him money subsequently. There wasn't anything particular said about expenses at the time of entering these lands. I paid the expenses. There was nothing said about the risk. I took the risk. This arrangement was made in this way, because, in transactions of such nature, I had to take considerable risks. I took the whole matter on his say so. All the expense of entering the lands, and all the work done in entering them, was done by me. There was nothing at all said about usury at that time. . . . I did not agree to advance the money to enter the land. No advancing about it. I was the party who had the money, and I was to enter the lands with that money, and have an interest in it. The agreement was in accordance with whatever the arrangement was between him and I. In addition to the interest I was to have in the land, I was also to have back my money; that was in the original agreement. I was to have back my money which it cost me to enter the land with. You didn't state it correct. I was to have back the purchase price. I was to have no interest on the money which I invested, unless the interest in the land gave me an interest,— a third interest in the land. I was to have a third interest in the land at the expiration of one year. That is a fact. The agreement which I executed contained the purchase price."

The defendant, *LeClair*, testified on his cross-examination as follows: "I had looked over every piece of these lands myself. I have been over the lands to estimate the timber on them. I have estimated the pine. I knew what was on the land when I went to *Mr. Schriber*, the plaintiff. I guess *Mr. Schriber* was cashier of that bank at Oshkosh at the time. He did not claim to know anything about these lands. He had never been on them, that I know of. I had seen him before. I had no business with him before,

except I drew out money from the bank. I had no business relations with *Mr. Schriber* individually. At that time I lived at Oconto. I knew at the time I went to *Mr. Schriber* that the value of the land was a great deal in excess of what the cost price of it was. *When I came to Mr. Schriber. and asked for a loan, he refused it.* At the time I went to *Mr. Schriber* he didn't word it exactly that 'the only thing he would do would be to go into this matter as a speculation with me, and he to furnish the money, and I furnish the minutes, and then divide the profits.' I said before what the agreement was. That was not the gist of our agreement. The contract was, as I said, that, in a transaction of that kind, he wanted a little more than ten per cent. He did not say to me that he would not let me have the money on this security unless he had a chance to make some profits out of it. He did not tell me that he would not let me have the money at ten per cent. He wanted one third of the profits. I don't know as he said he would not do any different, but he said he wanted a share in it,—he wanted a part of it. *He would not loan me the money.* I had to pay the purchase money back, but I expected to make enough to pay my expenses. I could not say that I expected to make about one half the proceeds on the deal after paying back *Mr. Schriber* the amount. I didn't offer him anything except my time. I didn't offer him any money,—merely my minutes. These minutes contained the descriptions of the land and estimates of the amount of pine timber on the respective forties. When I went up with the young man sent by *Mr. Schriber*, I believe he entered the land. I think he went up there for *Mr. Schriber.* I didn't pay him, and I don't know if *Mr. Schriber* did; don't know anything about it. The lands were entered at two different times. I don't remember, now, whether this was the first or second lot, that I went there. I only went there once. *Mr. Schriber* trans-

acted all the business with reference to entering the lands from my minutes. Our original agreement before the entering of the land was verbal,— nothing in writing. I had the minutes from the first day I went into the room with him. I showed him the minutes. He done the figuring; I didn't. These lands are wild, uncultivated lands, all of them. *Mr. Schriber* didn't tell me that the reason why he would not advance the money was that he would not take the risk of entering the lands unless he had a chance to make profits. He did not tell me that, that I remember of. He did not have any other proof as to those lands except what I told him. He took my word for it. Did not say anything to me about the expense and risk of loaning the money on these lands that I know of. I don't recollect; he might have said it,— I don't know. At that time I was living at Oconto. Before I made this deal with *Mr. Schriber* I had not offered these lands to other parties."

This is the only testimony as to what took place between the parties when the contracts were made, and it seems to me there is no foundation in this evidence for saying that there was any loan of money made by the plaintiff to *LeClair*. The plaintiff and defendant, *LeClair*, both testify that the plaintiff refused to loan any money on the land. *LeClair* says: "When I came to *Mr. Schriber* and asked him for a loan, he refused it." Again, he says: "He wanted one third of the profits. I don't know as he said he would not do any different, but said he wanted a share in it. He wanted a part of it. He would not loan me the money." Plaintiff says: "I wanted an interest in the land. He says: 'All right; of course that is understood that you shall have an interest in the land;' and he proposed then to figure it on the basis of about what the pine was worth. I knew white pine was worth $2 per thousand, but his estimates showed a good deal of Norway. He concluded that that was about the right figure,— to put it at about $2 per

thousand. I agreed to that, and took these minutes from him, sent my money by draft to Madison, and some of it to Menasha, and entered these lands. Subsequently we executed the contracts." Again, the plaintiff says: "It would look very queer of a man of my make, that I would lend money at ten per cent. interest on that kind of security. If I wanted to lend money, I would have asked him for security in addition to the purchase money of that land,— would not have taken it, under no account."

It seems to me this parol evidence clearly shows that there was no dealing between the parties as lender and borrower. Certainly there is nothing in the written contracts unexplained which in the least tends to show any such relation between the parties. The written contracts are simply contracts on the part of the plaintiff, who, from all the evidence, is shown to be the owner of the land by purchase from the government, to sell the lands, or two-thirds interest in them, to the defendant, *LeClair*, for stipulated sums, to be thereafter paid by him.

But it is argued, as a reason for holding that this transaction was a loan of money by the plaintiff to the defendant, that the evidence shows that the plaintiff was to have his money advanced back, at all events, at the end of one year from the date of his purchase. In a case of this kind it appears to me, if the evidence clearly establishes the fact that such was the agreement, it would not be at all conclusive that the transaction was a loan of money by the plaintiff to the defendant. Suppose the defendant, in approaching the plaintiff on the subject of the entry of these lands, had said nothing about a loan of money, but had simply said to *Schriber* that he had ascertained there were a lot of valuable government lands subject to entry which were worth at least three times as much as it would require to purchase them from the government; that he had no money to enter the land, and he was anxious to find some one who had

money to do so, and who would do so and give him a part of the profits which were likely to result from such entry; and the plaintiff had said: "Well, you say these lands are worth three times the government price. Now, I will do this, on your statement: I will enter the lands, and, at the end of one year from the entry, you can have the lands for just the money I pay out for them, and one half the sum you say they are worth over the government price; or, if you don't see fit to do so, that I will take one third of the lands for my share of the profits, and you shall have the other two thirds at the end of one year, by paying me back the purchase money, you in the mean time to pay the taxes on such two thirds, if any are assessed on them during the year,"— and suppose the defendant absolutely bound himself by written promise to take the two thirds at the end of the year, and pay the purchase money. Under such a state of affairs, it seems to me that no court could hold that the relation of mortgagor and mortgagee existed between the parties. The above is substantially what took place between these parties. Can it possibly make any difference as to the effect of such a contract, that, when the defendant first approached the plaintiff, he asked for a loan to enter the lands, which both parties say was refused. It seems to me that, after the application for a loan was declined, the transaction is not to be changed in its nature merely because an application for a loan was first made and declined.

That the defendant, *LeClair*, never supposed that he had made a loan of the plaintiff, for which he had given the plaintiff security upon the lands he never owned and for the purchase of which he never had any contract with any person, until after the commencement of the action, is evident from his conduct, and especially from his written communication to plaintiff made a short time before the action was commenced, and which is made a part of his answer in the case. In this communication there is no suggestion

that the transaction between him and the plaintiff was a loan of money on the security of the lands in question, but he proposes to execute on his part the contracts of sale and purchase as he had made them with the plaintiff; and the only contention was that he should receive a greater credit for certain payments he claimed to have made on the contracts, and also claiming that he ought not to pay interest, because the plaintiff had not tendered any conveyance of the lands as stipulated in the contracts. The claim that this was a loan upon a mortgage was never, so far as the evidence shows, thought of or claimed by the defendant *LeClair* until this action was commenced; and it is fairly inferable that this claim was the suggestion of his learned counsel, rather than a claim honestly made by the defendant, based upon the real facts relating to the transaction.

If we apply a few general rules which the courts say should govern in determining the true character of a transaction of this character, I think that it disposes of the claim that this was a loaning of money by the plaintiff to *LeClair*. *First.* The most general rule is that the intention of the parties at the time of the transaction should govern. *Smith v. Crosby*, 47 Wis. 160, 165; Jones on Mortg. secs. 25, 293; *Conway's Ex'rs v. Alexander*, 7 Cranch, 218; *Ruckman v. Alwood*, 71 Ill. 155. *Second.* To convert a deed absolute into a mortgage, the evidence should be so clear as to leave no substantial doubt that the real intention of the parties was to execute a mortgage. *Kent v. Lasley*, 24 Wis. 654; *McClellan v. Sanford*, 26 Wis. 607; *Murphy v. Dunning*, 30 Wis. 301; *Kercheval v. Doty*, 31 Wis. 491; *Sable v. Maloney*, 48 Wis. 331; *Henley v. Hotaling*, 41 Cal. 22; *Haynie v. Robertson*, 58 Ala. 37; Jones on Mortg. secs. 260, 266. *Third.* The presumption is against the defense of usury. *Hale v. Haselton*, 21 Wis. 320.

Under these rules, is there such a preponderance of evidence in this case against the findings of the learned circuit

judge as to justify this court in reversing them? I am clearly of the opinion that there is no such preponderance. On the contrary, I think his findings are sustained by the evidence in the case, and that it is only by giving an unnecessary and unnatural construction to the evidence that it can be said that such evidence shows the case of a loan of money by the plaintiff to *LeClair*, upon the security of the lands in question. *Butler v. Butler*, 46 Wis. 430.

I think the judgment of the circuit court should be affirmed.

